Good morning, your honors. May it please the court, Robert Swain for appellant Hector Carreon. I'd like to focus this morning on the issue of the statements and whether the district court erred by denying the motion to suppress the statements taken by Mr. Carreon at the time of the search warrant and it turned out to be the day of his arrest. Of course it's no secret we're relying primarily on Craighead and it's our opinion the government has wholly failed to distinguish Craighead. Even if we agree with you that there was a Miranda violation, why was it harmful here? What did he say that wasn't already in other testimony? As the district court pointed out at the end of the trial, this was the direct evidence that it was his computers. He admitted that he was the only one that used the computers. He admitted that he alone had downloaded anything that was on the computers. But wasn't the downloading account in his name already? Wasn't there other evidence of that? Well there was some circumstantial evidence, no doubt. I'm not saying that without this evidence that we're guaranteed to win a rule 29 next time around. But you have to remember that the standard on a constitutional violation is that the government has to prove beyond a reasonable doubt that the error was harmless. And here they relied on it, the district court relied on it. The district court specifically said that it was relying on the fact that the defendant admitted that he had downloaded child pornography. And in his statement he admitted that he downloaded child pornography. And so absent any other direct evidence that he had sole and exclusive use of the computer, I think it's hard. But didn't the wife testify that it was his computer and no one else used it? Well as far as she knew. So who else lived there? I mean who else could have used it? There was a nephew who was referenced who was staying at the house. The other thing too is that maybe there would be a different trial strategy if the statements were not admitted at trial. But the wife gave some circumstantial evidence, but she said she wasn't there all the time. She was working. She could not say for sure. She hadn't been on the computer. She didn't know how the computer was set up. And so while it's true she did say that as far as she knew that it was the husband's computer. It's not the direct evidence out of the defendant's own mouth. Yes, this is me exclusively and I knowingly downloaded child pornography. Because there's also the issue of the knowingness apart from the dominion and control which the wife's testimony goes more to in terms of the knowledge element of the receipt and possession counts. But the LimeWire account was in his name. He had registered for it. It's hard to do that without knowing you're doing it, right? Well I think that that depends. I mean it's very complicated on these download systems. People can mark all kinds of files and numerous files get downloaded. So in terms of the knowing element of the specific images alleged in the receipt and possession counts, I think that this is the best, most damaging direct evidence. And the district court specifically relied on it when he ruled at the end of the trial that the evidence was sufficient. To find the defendant guilty beyond a reasonable doubt because the defendant admitted that he himself had downloaded child pornography. I don't know if that's an indication that I shouldn't go back to my original argument. Not for my sake. I don't know about my colleagues. But I guess I would like to go back a little bit to Craighead because in fact this case is stronger than Craighead to show that it was a police dominated atmosphere. In Craighead there were eight armed agents. Here there were 11. And in Craighead the defendant was never handcuffed. Guns weren't pointed in his face. After all, in this case, when the agents went up to this small bedroom, the agent testified there was barely any room to even stand in the room. And he and at least one other agent had their rifles out trained on the defendant. He's handcuffed. He's put up against the wall. He's taken downstairs. And within a matter of minutes, 20 minutes max, is when the interview begins. And the factors that Craighead looks to says, because there's a passing reference that you can leave the house, is that really meaningful when the police are in every single room of the house? In fact, during the statement the agent tells Mr. Carrion there's police in every single room of the house. And it's kind of a false offer to say you're free to leave when really the option is sit on the couch and don't move or leave your own house and you can't come back. How's he supposed to leave? The car that's at the house is also subject to the search warrant. He certainly wasn't going to be allowed to drive away from the house. And so when you combine that with the context of the statement itself, in Craighead there was no allegation whatsoever that the defendant was coerced in any way. And here, of course, we've got the statement in the record that shows that every time the defendant made an attempt to say that maybe he should talk to an attorney, he was talked out of it. And not only was he talked out of it, but that was when the agents said, well, you know what, maybe it's better you make a statement so we don't have to go to your neighbors or to someone else in the family. It's obviously an attempt to keep him talking so he's not embarrassed by other people. Then we have the allegation of if you keep talking to us, we won't have to get CPS involved. And that's a long process, the agent tells him. So the whole context of the police-dominated environment, where an individual has gotten out of bed in his underwear at point-blank range with guns, handcuffed, taken downstairs in a house in a small town. Not Miranda. And told that he's free to leave. Well, he's told once he's free to leave, but of course in Craighead the defendant was told he was free to leave. And when you take the totality of the circumstances, that doesn't mean anything when you're free to leave where? You can't leave in your car. The car's subject to the search warrant. You can't go to any room in the house that you want to. What about the length of the sentence? Yeah, would you talk about the sentence? Well, I guess the main aspect of the sentence, of course we're saying it's unreasonable for a 50-year sentence, especially in light of the fact that the counts one and two, the most serious counts, those are the production counts, were the subject of a state prosecution. So the actual allegations or the conduct in counts one and two was the subject of the state prosecution where Mr. Carrion was originally sentenced to 240 years to life. I just looked that up. Interestingly, the Court of Appeal reversed that under the complex state sentencing laws. The argument was that it's a maximum of 45 years to life that he can get on the counts relating to? How old is your client? At the time of sentencing, he was 44 years old. It was undisputed from the probation report and the evidence that he submitted that he was in poor health. He had diabetes. He had high blood pressure. He was overweight. It's the functional equivalent of a life sentence is what we tried to argue to the judge and why it was substantially unreasonable. And, of course, interwoven in the sentencing issues were the two sentencing enhancements for distribution when there wasn't a shred of evidence that he intended to distribute any child pornography. Of course, it's undisputed that the most serious counts, one and two, were never uploaded, never transported. We're bound by Vallejos on that issue, though, aren't we? Well, Vallejos is similar, but that's for one of the increases. The other increase I don't think Vallejos referenced. So Vallejos deals with the distribution issue. Just explain what you just mean. What doesn't Vallejos cover? Well, I'll save a couple of minutes. There's two guideline sections, one that we objected to. Both have to do with the enhancements for distribution. Vallejos talks about one of the guideline sections, but we have the other guideline section, although we objected to both. And I think the difference is also I think Vallejos left open a situation where there was absolutely no evidence whatsoever that the individual would know because in Vallejos there was some evidence that the defendant would know that it was possible for people to come onto your computer and take what you have in this shared file. I thought Vallejos just said that if you show any technical savvy, if you can set up an account, then we assume that you know that. Well, my reading of it is that there has to be at least something more. What was the more in Vallejos? Well, my recollection was that there was some indication that the defendant would know how it works. And it has to do with setting it up. Do you want to save a little time? Yes, yes. Thank you, Your Honor. Good morning. May it please the Court. Mark Rahe for the United States. Your Honors, there was no violation of Moran in this case because the defendant was not in custody. Look, they come into his house, 11 of them, armed, wearing protective gear. He was forced out of bed at gunpoint, put in handcuffs, taken to a separate room and interviewed. And you're telling me that he wasn't in custody? Correct, Your Honor, because you have to look at all of the facts. If he was taken directly to an interview after all the things that happened in the bedroom, that might be one thing. But what the record shows is that at least 20 minutes transpired. By the time he's brought downstairs, he's no longer in handcuffs. But he's got 11 armed officers surrounding him in his house. Well, not necessarily. I mean, when one looks to Craighead, in Craighead, where that defendant was taken, he was actually interviewed in a rear bedroom. There was a detective with a gun with his back to the door. Here you have two agents in a bedroom in civilian clothes. They testified that they were armed. They were armed. Right, but not visibly armed. He knew they were agents, didn't he? He did know they were agents, correct. But then also when one looks at Craighead, one of the key facts that was found there to find custody was that there were at least multiple agencies. And so when that defendant was told that he wasn't under arrest, they said, well, he may reasonably have thought, even if one agent tells me that, I may go get stopped by somebody else. Here, all of the agents were from HSI. And was there any evidence that he knew that? How does he know that the 11 officers are all from the same agency? Well, that's true. That's not necessarily. That's not in the record. But here's another thing I'd point out. I mean, this is a direct quote from Supplemental Excerpt of Record, page 2. The agent tells them right at the very outset, and again, this is 20 minutes after the very dramatic entry. I just want you to know up front that we are not, you are not under arrest at this time. You do not have to talk to us right now. You're free to leave. You know it's up to you. When they talk about keeping the door closed, they say, we are keeping the door closed for our privacy, your privacy, that kind of thing. If you feel more comfortable with it open, let us know. And Mr. Carrion says, this is fine. They say, if you need water, if you need the bathroom, anything like that, again, you know, we're not holding you captive or anything here. So you can move around as you wish. Now, where was he supposed to go? Well, he could, I mean, realize, Your Honor, if you're going to find custody based on the fact that somebody simply interviewed at home, then it would be per se custody in every case. He could leave. All this discussion about a vehicle, there's none of that in the record below. There was no evidence that he couldn't have left. They specifically told him. Was the vehicle subject to the warrant? It probably was, but there was no talk whatsoever about it. If one wants to look at the objective circumstances, if we're going to say he didn't necessarily know that they were all from the same agency, I don't see how we can infer from this record that he would have realized that he couldn't leave, specifically when they told him. You know, you can either stay here and sit on the couch, or you can leave and then you can come back when we call you. I mean, yes, this is not a fun situation. It's dramatic. But our point is, if these are factual findings, this defendant, I mean, he's told repeatedly throughout. Did they show him a search warrant? Say, what was that, Your Honor? Did they show him the search warrant? Yes, they did. And that's also the second thing they said. You got a chance to look over the search warrant, Mr. Carrion says, uh-huh. So, you know. Maybe you should talk about harmlessness. Exactly, Your Honor. Obviously, our position is that any error would be harmless. First and foremost, the first two counts are production and attempted production. There is not a single thing of this statement that goes into that, because those counts had nothing to do with computers. They had to do it. And they've conceded that, I think. Right. It doesn't affect those counts. Okay. Because, yeah, I know in the reply brief they said there probably wasn't an argument. Now, for the remainder, what we have here, as Your Honor pointed out, the first witness the government called was the defendant's wife. She unequivocally testified that the only computers there were his and that he was the only person who used them. And, again, I don't think it's rank speculation to talk about the nephew who happened to be there for a few days, because she specifically said that no one else uses those computers. There was forensic evidence, and Rob Gruntz, the computer forensic agent, testified about that. These files, both the receipt count three and the rest of the files, were all found in a folder with his name, Hector Manuel Carillo, and there was no room for the N, but he clearly had to have typed that out. Our position is you can infer definitely from that alone that he received it. There was the date stamp for count three of April 23, 2010. That, again, was proven by forensic evidence. Was there evidence about whether the nephew was there on the day of that date stamp? That I don't know, Your Honor. I think he made brief reference to the nephew, and I think maybe the nephew had already left by the time, but I'm not sure about that. Again, we realize that in order to prove harmlessness for a constitutional error, it's a heightened standard, but we think here that standard is clearly met, and especially with respect to those first two counts, which, as Your Honor pointed out, there's no real dispute. Would you explain that there was a camera that had a brief segment that showed him doing bad things? Correct. Is Your Honor referring to count two, the attempt count? I think so, yeah. That's correct, right, and that was a Sony hand cam, handy cam, and there was a 34-second video on that. Now, if you want me to address the sufficiency of the evidence, I know my opponent claims that there's not enough evidence to sustain an attempt conviction. Right. We have two prongs to that. I mean, first of all, under basic attempt theory, you need that specific intent, and you need that substantial step that's more than mere preparation. We would submit respectfully that when there is a video of the defendant masturbating just inches from the face of a child, that has clearly gone way beyond the scope of mere preparation. And here, as we point out, I know my opponent seems to suggest from his briefing, well, he didn't touch her, he didn't actually penetrate her, he didn't ejaculate on her. Sorry to bring up all these details, but this is what we have to look at. What the law says is that none of those things are necessary even for a completed act. If we agree with you about that completed act argument, do we need to publish in this case? Is that something that our court has decided before? In my understanding, no, and there is a case we cited from, I believe, Iowa, United States v. Loge, L-O-H-S-E. I should have sent a 28-J up. I'll send it after the argument. The 8th Circuit recently, I believe, yeah, recently affirmed that and found in very similar circumstances that another defendant who simply took pictures of himself with his genitals near a sleeping child. It's almost exactly the same as this case, right? Exactly. I mean, our point basically is, you know, a completed act, I think the prosecutor blow and an abundance of caution just went on an attempt theory, but this is a pure issue of law. The facts are undisputed. We're not trying to change the evidence at this point. What the statute says, it talks about lascivious conduct, the exhibition of any person's genitals, so it doesn't have to be the child's. But yeah, you don't even need to get to the attempt if you find a completed crime. But here, the other thing I'd point out too, I mean, as the district court himself found, when you look at the charged conduct in count one, those acts of the hour-and-a-half video from 10 years prior, each one of those ended eventually with contact, with ejaculation onto the minor. Those are charged acts. They're not even 404B, but if you wanted to even consider that as 404B, of course, one of the classic uses of 404B evidence is to prove intent. So as the district court even pointed out, that 34 seconds, the reason the camera stops is because the defendant hears his wife's voice in the other room, but the district court said, I can reasonably infer based on the record that he would have done what he did then. He did ask for a lawyer, didn't he, four times? Well, he made three mentions of a lawyer, Your Honor, and that's something I want to be clear too. When you read my opponent's brief at first glance, it sounds like they just pushed this on the side, but they didn't. I mean, when he talked about it the first time, he said, do I need to speak to a lawyer? The agent immediately said, that's up to you. We can't advise you of anything. Another time, another example of page seven of supplemental excerpts of record, the defendant says, if I said I want to talk to my lawyer, would that be giving you a hard time? And what's the immediate response from Agent Spooner? No, no, not at all, not at all. Now, of course, the agents, you know, they're there to interview the defendant. They're going to try to get a statement from him, and they tell him things like, you know, you'll help yourself by making a statement, as this court has held in many cases. That's not enough. He didn't show much respect for his right to counsel, and he was certainly advised of his right to counsel. Well, he actually wasn't advised of his right to counsel, because that's the whole issue here. He wasn't. He wasn't, right. I just wanted the people in the room to hear that. Yeah, no, I understand. But I know also at the very end, you know, my opponent says he admitted to downloading pornography, child pornography. The one time he said he did that, he said he deleted it. And at the very end, he's been very evasive with them. He says, I think it's better if I get a lawyer, and they said, okay, that's your right. We appreciate that. So it's not like they completely ran roughshod, you know. No, but they weren't there to really give him a complete statement of his rights and make sure that he understood them and all that. They're supposed to do that, aren't they? Well, they are if it's a custodial situation, Your Honor. But if they believe it's a consensual interview, then that's the crux of the matter. You think he believed it was consensual? Objectively, we look at an objective person, Your Honor. I mean, when they tell them at least five times, you're not under arrest. I mean, yeah. Could you, with respect to the sentence, could you take us through how we got to a 50-year sentence here? Exactly. Yes, Your Honor. And look, there's no question that's a severe sentence. But the government's position is that this was unbelievably horrific behavior, though. And of course, it's an abuse of discretion standard. You get to that 50 years by the following three facts. First of all, on the completed act of production, which was the most serious offense, he got the 30-year statutory maximum. For count two, the attempt, which is often the case, he got half of what he would have gotten for the complete sentence, the 15 years, which also happened to be the mandatory minimum. And then for the receipt, which is count three, that's a five-year mandatory minimum. What the district court did was it then ran those three consecutively. And then as far as the four counts for simple possession, those were five-year concurrent terms. Now, I know my opponent, he brings up an argument, which isn't the first time, about how the child pornography, the possession and receipt guidelines, they've been under a lot of scrutiny, a lot of criticism. Maybe the commission's going to change them. But our point on the substantive reasonableness is, in a way, everything here kind of did work out by the gradations of gravity of the offenses. Well, on the distribution and the attempt, is that the same conduct? No, Your Honor. I was a little confused about that. The distribution, that's the Vallejos issue. That issue is about the use of... Lime wire. Right, peer-to-peer software, and that was Judge Gould's opinion from a year ago. Basically, you get the plus two for that, and then what he didn't get was a minus two. It comes right near it in the guidelines. It seems a little confusing at first, but they are separate issues. And our position is, if this court wants to get to that level of whether that specific offense characteristic was appropriately applied, in Vallejos, the way I read it, this court said, you just have to prove knowing use of peer-to-peer software. Here, you can tell that from the statement, which incidentally, even if you were to exclude it, the exclusionary rule wouldn't apply to sentencing. This defendant said he'd used these computers for years. He knew about peer-to-peer file sharing software. He talked about... But we don't even need that under Vallejos, right? I mean, we just assume that, because he was obviously using the software. He knew how to set up an account, and he was using it. Exactly, and there is, I believe, a footnote to that opinion where it says, I think Judge Gould wrote, maybe in a rare case, if there was total ignorance, if the record showed complete lack of sophistication with the computers, maybe then we would entertain not applying it. I just wanted to be clear on the record, too. At page 908 of Vallejos, the court says, we therefore conclude that the two-point enhancement distribution was proper, quote, who used a file-sharing program to download child pornography that, whether knowingly or unknowingly, allowed others access to those files. And from that, we don't believe that the Ninth Circuit requires proof that he actually knew other people's downloaded. And that's the plus two. He then did not get a minus two for failure to distribute, because that particular guideline says your conduct has to be limited to receipt or solicitation. Here, obviously, there was also production and attempted production, Your Honor. He didn't put the pornography that he produced on LimeWire, though, did he? Or is there evidence that he did? It was on the separate cameras, right? Correct. And that was asked at trial, and there was no evidence that any of that got transferred. But, I mean, maybe just to follow up with the end of my time. I mean, again, yes, 50 years is a serious sentence, but under abusive discretion review, every single point that the defendant brought up was considered by the court below. And to the extent that he had health problems, he's going to get free medical care in custody. To the extent he also had a good side to him, well, the district court took that into consideration, read those letters. But the fact of the matter is there were multiple victims, extremely young age, all of whom were family members, grandnieces. There was evidence that he even had drugged some of these victims. I mean, the district court said it was apparent to me the minute I watched these videos, and that was what really hurt. And, in fact, as we point out in our brief, this was a rare case where one of those victims was present at the sentencing hearing, and she actually allocuted and talked about Uncle Hector's blueberry Kool-Aid, and we would drink it, and then the next day we didn't feel right and some of our clothes would be missing. I mean, it's all horrible. It's all tragic. Wish it never happened, of course, but on appellate review of abusive discretion, I don't think it can be said that Judge Houston abused his discretion. Thank you. Thank you, Your Honors. Thank you. No doubt there's horrible and tragic facts that are present in the case. We've known that. We recognized that from the beginning of the case. But, you know, we still have to apply the laws as required. And I would just direct the Court to my opening brief of page 51 and 52, which sets out the two separate guideline sections. And, you know, maybe I'm trying to make too much of the footnote in Vallejos, but I read Vallejos as saying that there has to be some evidence because the defendant in that case testified that he, if I remember correctly, testified that he had some modicum of expertise with the computers, and there wasn't that testimony here. And, of course, it's a separate issue under 2G2.2, which is that we felt he was entitled to a decrease because it said that the language of the guideline is the defendant did not intend to traffic in or distribute such material. And, once again, there was no evidence whatsoever that he intended to traffic in the material. Now, if I could just go back briefly to two points. You know, the government is just trying to isolate a couple of statements to the defendant that he wasn't under arrest, ignoring the totality of the circumstances, and including the statements themselves that the government refers to. In one of the situations, the agent goes on for 21 lines after Mr. Carreon asks about, well, maybe I should have an attorney present. He goes on for 21 lines saying, oh, well, no, this is your only chance. This is your chance so that I can write a report to the prosecutor. So, you know, the evidence is overwhelming that he was coerced in a police-dominated atmosphere. As far as the harmlessness, you know, yeah, there's some inferences in the government's words that he would have known some of these things, but it's proof beyond a reasonable doubt the district court relied specifically on his statement where he admitted that he downloaded the child pornography. And it's just unfair now on appeal for the government to say, oh, well, that's harmless. He would have found it anyway. There's just no evidence. The court didn't recite any other facts in upholding his judgment of guilty against Mr. Carreon. Listen, we have your argument well in hand. Thank you, Your Honor. Thank you. We'll call the next matter. This matter is submitted.
judges: Schroeder, Pregerson, Friedland